UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                       :

UNITED STATES OF AMERICA         :       S1 05 Cr. 1110 (AKH)
                                         :

        -v.-                    :       Related To:
                                         :       07 Cr. 555 (AKH)

DOMINICK COLASUONNO and     :
PHILIP COLASUONNO,           :
                                       :

            Defendants.        :
                                       :
-------------------------------------------------------- X


## GOVERNMENT'S SENTENCING MEMORANDUM


                                          MICHAEL J. GARCIA
                                          United States Attorney
                                          Southern District of New York


Of Counsel:
       Daniel W. Levy
       Thomas G. A. Brown
       Assistant United States Attorneys

The Government respectfully submits this Memorandum in advance of the sentencing of defendants Dominick Colasuonno and Philip Colasuonno, currently scheduled for July 19, 2007, at 10:30 a.m.

For the reasons set forth below, the Court should:

(I)     adopt the loss calculation agreed to by the parties;

(II)    deny the defendants credit for acceptance of responsibility;

(III)   deny Philip Colasuonno's motion for a downward departure under U.S.S.G. § 5H1.4;

(IV)    impose a Guidelines sentence -- of between 41 and 51 months for Dominick Colasuonno and between 46 and 57 months for Philip Colasuonno -- because such a sentence is reasonable and adequately reflects all of the factors required to be considered by the Court under 18 U.S.C. § 3553(a);

(V)     impose restitution in the amount of $781,467.04 in favor of the United States on the tax offenses charged in Information 07 Cr. 555 (AKH);

## I.    **The Government's Response to the Court's Inquiry Regarding Loss**

By Order, dated June 22, 2007, the Court ordered the parties to submit various information in connection with the loss calculation under the Sentencing Guidelines.  The Government stands by the loss calculation agreed to by the parties in plea agreements, more than $200,000, but less than $400,000.  Copies of the defendant's plea agreements are attached hereto as Exhibits A.1 (Dominick Colasuonno) and A.2 (Philip Colasuonno).  In the plea agreements, the parties explicitly retained their right to respond to Court inquiries such as that contained in the June 22, 2007, Order, and the Government provides

the information set forth below pursuant to those provisions.[1]

Prior to doing so, the Government notes that, although the Court "need only make a reasonable estimate of loss," U.S.S.G. § 2B1.1, comment. (n.3(C)), should the Court intend to give a non-Guidelines sentence, then the Court need not make any finding as to the amount of the loss. Specifically, if the Court, "having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence," then "precise calculation of the applicable Guidelines range may not be necessary." See United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) (noting that such "leeway should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters, for example, determination of monetary loss.").

The Government responds to the Court's Order as follows:

| Line No. | Item | Amount | Notes |
|---|---|---|---|
| 1 | Long term debt to JPMC (Business Installment Loan) | $3,238,000 | Source: 5/8/02 CFR (GX 130) at JPMC 18890 |
| 2 | Short-term borrowings from JPMC (Own Paper Line with credit limit of $2 million) | $2,306,000 | Source: 5/8/02 CFR (GX 130) at JPMC 18890 |
| 3 | **Approximate amount of loan at time of defendants' first misrepresentation (April 2002)** | **$5,544,000** | **6/22/07 Order ¶ A** |
| | | | |
| 4 | **Value of collateral that could be liquidated** | **$5,762,695** | **6/22/07 Order ¶ B; Source: adjusted 2001 gross fee income from 5/8/02 CFR (GX 130 at JPMC 18908) and 2001 financial statements @ 1x fee income** |

---

[1] The defendants did not submit a response to the Court's June 22, 2007, Order as part of their sentencing submissions.

2

| Line No. | Item | Amount | Notes |
|---|---|---|---|
| 5 | Loss exposure before defendants' misrepresentations (Line 3-Line 4) | -$218,695 | 6/22/07 Order ¶ C |
| | | | |
| | | | |
| 6 | Total debt at end of relationship (March 21, 2005) | $6,975,000 | |
| 7 | Settlement amount | $3,500,000 | 6/22/07 Order ¶ D |
| | | | |
| | | | |
| 8 | Total loss caused by defendants' fraud = Net of all payments by defendants and liquidation (Line 7), less loss exposure before defendants' misrepresentation (Line 5) (6/22/07 Order ¶ C) | $3,718,695 | 6/22/07 Order ¶ D |

Explanatory notes regarding:

Lines 1 through 3:  The source of the information used to calculate the amount of the loan as of the time of the defendant's first misrepresentation is the annual credit facility review ("CFR") prepared by Anne Marie Stefanucci, the financial analyst employed by JPMorgan Chase, N.A. ("Chase") to analyze the financial statements of clients of Chase's check casher's department.  The 2001 CFR is attached hereto as Exhibit B.  As of May 8, 2002, the date of the CFR, Prima Check Cashing, Inc. ("Prima") had two forms of indebtedness to Chase:  (1) a business installment loan with a balance of $3,238,000, on which Prima made monthly installment payments of $73,315; and (2) an "own paper line" of credit, which was, in essence, the balance in Prima's primary demand account at Chase, which was approximately -$2,306,000 at the time of the CFR, i.e., it was overdrawn by approximately $2,306,000.  The amount outstanding on the line of credit fluctuated on a day-to-day basis, but the amount reported as of May 8, 2002, is relatively consistent with the amount reported by Prima in its 2001 financial statements as the amount as of December 31, 2001 (-$1,952,000).  See GX-215 at 3,8 (attached hereto as Exh. C).

Line 4:  The manner in which the Government has calculated the amount of collateral that could be liquidated is as follows.  The Government did not use, as its starting point, the book value of Prima's assets, as reported on its 2001 financial statements, because, first, the amount shown for fixed assets was substantially inflated, as the Government proved at trial, and second, the Government could not determine from Prima's financial statements the market value of its fixed assets and certainly not the

3

value that Chase could have obtained if it had to liquidate the fixed assets for particular stores. Instead, the Government employed as a valuation measure one method that Chase used, which was based on the gross fee income earned by a check casher business. See Exh. B at JPMC 18890. Accordingly, the Government began with the gross fee income reported by Prima for the calendar year 2001 ($5,853,355), see Exh. C at 12, less various elements not considered by Chase in calculating gross fee income (totaling $90,660), see Exh. B at JPMC 18908, to arrive at a total adjusted 2001 gross fee income of $5,762,695.

Chase considered an industry valuation of a check casher business to be between 1 and 1.5 times gross fee income. See Exh. B at JPMC 18890. In determining where between 1 and 1.5 times gross income to set this amount for the stores as they existed in early 2002, the Government has analyzed the prices for the sale of various Prima locations that have been currently negotiated (the only source of data regarding the market value of Prima's locations) and compared that amount to the 2005 gross fee income for those locations. The Government obtained the former (the current negotiated sale prices for various Prima locations) from counsel for Prima and obtained the latter (the gross fee income for those locations) from the New York State Banking Department (the "NYSBD"). The electronic mail message from Prima's counsel is attached hereto as Exhibit D and the gross fee income information reported by Prima to the NYSBD is attached hereto as Exhibit E. The Government then determined that, for the eleven stores where sales prices have been determined, the average ratio of sale price to gross fee income is .9899. The spreadsheet setting out the Government's analysis is attached hereto as Exhibit F. Based on this calculation, the Government determined the value of Prima's locations as of April 2002 by multiplying total adjusted 2001 gross fee income ($5,762,695) by 1.

In using the gross fee income for 2005 to check where between 1 and 1.5 times gross fee income to set the valuation of Prima's locations as of April 2002, the Government sought to minimize the effect, if any, that the charges against the defendants and their subsequent trial had on the business of their individual check casher locations. Although the Government does not believe that the average customer would be impacted by the fact that the defendants had been arrested, indicted, or were convicted at trial, in order to minimize the impact that the defendants' prosecution had on this analysis, the Government used 2005 gross fee income, rather than use 2006 figures for gross fee income. The defendants were arrested in June 2005. In addition, at least six of the sales were negotiated during the latter half of 2006, meaning that total annual gross fee income would not have been available to the purchasers of these stores during their negotiations with Prima's owners.

This analysis also assumes that individual store locations are freely able to be liquidated. In fact, the NYSBD must approve all sales of licensed check casher locations, thereby limiting to some extent the liquidation value of the Prima locations and militating in favor of a lower ratio (i.e., closer to a valuation of 1x gross fee income and further from a valuation of 1.5x gross fee income).

Line 5: As of approximately early May 2002, assuming that Chase's debt had first priority of all of Prima's debt (which the Government believes is the case), Prima's debt to Chase was somewhat over-secured (by approximately $218,695).

Lines 6 and 7: At the end of Prima's relationship with Chase, Prima was indebted to Chase in amount of approximately $6,975,000 (line 6). On or about March 21, 2005, Prima and Chase severed their relationship and Prima paid Chase $3.5 million (line 7), approximately half of the outstanding debt. As Richard Grabelsky, the workout specialist at Chase, testified at trial, rather than accept Prima's offer to fully pay off its debt to Prima over a term of years, Chase chose to exit its relationship with Prima. Among other reasons for this choice was that Chase was, at the time, exiting the check casher business and would no longer be able to provide currency services to Prima. Tr. 1902, 1923-24.

Line 8: As set out in the Court's June 22, 2007, Order, the amount of loss actually experienced by Chase at the end of its relationship with the defendants is $3,500,000 less -$218,695, or $3,718,695. It should be noted that the fact that Chase was oversecured by approximately $218,695 in April 2002 results in an increase in loss under the methodology set out in the Court's Order. This is a rational calculation under the Court's methodology because, if Prima and Chase, in essence, bargained for Chase to be more than sufficiently secured, then the fact that this cushion was taken from Chase as a result of the defendants' conduct should result in an increase in the loss sustained by Chase. In any event, a difference of $218,695 would not change the applicable Sentencing Guidelines range. See U.S.S.G. § 2B1.1(b)(1)(J) (providing for 18-level upward adjustment for losses between $2.5 million and $7 million).

## II.    The Defendants Are Not Entitled to Credit for Acceptance of Responsibility.

Dominick Colasuonno argues that, because he pled guilty to the tax charges, on that group of offenses, he should benefit from an adjustment for acceptance of responsibility. This argument misconstrues the manner in which the Sentencing Guidelines function. Acceptance of responsibility is a unitary concept that applies to all

5

of a defendant's criminal conduct or none.

As he concedes and as the parties agreed in their plea agreement, see Exh. A.1 at 3-4, Dominick Colasuonno's offenses are divided into two groups. The first group is comprised of the substantive bank fraud of which Dominick Colasuonno was convicted at trial. The total adjusted offense level for the group comprised of the bank fraud charge is 19. The second group is comprised of the tax conspiracy and substantive tax offense to which Dominick Colasuonno pled guilty. Prior to any adjustment for acceptance of responsibility, the parties agreed that the total adjusted offense level for the group comprised of the tax offenses is 20.

Dominick Colasuonno seeks to apply the acceptance of responsibility provision, U.S.S.G. § 3E1.1, on a group-by-group basis. Specifically, he would calculate the offense level for the group comprised of the substantive bank fraud count without any adjustment for acceptance of responsibility (because he was convicted at trial) and, separately, calculate the offense level for the group comprised of the tax charges with a 3-level downward adjustment for acceptance of responsibility (because he pled guilty to those offenses). Only then would he upwardly adjust the offense level for the bank fraud group, pursuant to U.S.S.G. § 3D1.4, by 2 levels, resulting in a total offense level of 21, rather than 22. Compare Sentencing Memorandum of Dominick Colasuonno at 3-4 (dated July 5, 2007) (hereinafter "D. Colasuonno Memo."), with Exh. A.1 at 4-5.

The Sentencing Guidelines do not, however, countenance a group-by-group approach to the application of U.S.S.G. § 3E1.1.  Acceptance of responsibility is a unitary concept that applies either to all of a defendant's criminal conduct or none and is applied after the grouping rules.  This legal conclusion is obvious from the manner in which the Sentencing Guidelines direct that, <u>first</u>, the grouping rules (Chapter Three, Part D) are applied to each separate group of offenses and, <u>then and only then</u>, do the Sentencing Guidelines direct that the acceptance of responsibility provision (Chapter Three, Part E) be applied.  <u>See</u> <u>United States v. Eng</u>, 14 F.3d 165, 171 & n.3 (2d Cir. 1994) ("we note, however, that adjustments for acceptance of responsibility under Part E of Chapter Three are made <u>only after</u> the counts are combined.") (emphasis added); U.S.S.G. § 1B1.1(d-e) (directing that grouping rules be applied and then acceptance of responsibility provision be applied).  This result is further supported by the commentary to the grouping rules, which make clear that the acceptance of responsibility provision is applied <u>only after</u> the grouping rules are applied.  U.S.S.G. Ch. 3, Pt.D, intro. comment ("[t]he single, 'combined' offense level that results from applying the[ rules regarding multiple counts] is used, after adjustment pursuant to the guidelines in subsequent parts [<u>i.e.</u>, Part E - acceptance of responsibility] to determine the sentence"); U.S.S.G. § 3D1.1, comment. (backg'd) ("[t]his section outlines the procedure to be used for determining the combined offense level.  After any adjustments from Chapter 3, Part E (Acceptance of Responsibility) . . . are made, this combined offense level is used to determine the

7

guideline sentencing range"); U.S.S.G. § 3D1.5, comment. ("The <u>combined</u> offense level

is subject to adjustments from Chapter Three, Part E (Acceptance of Responsibility)"

(emphasis added).

This was the conclusion reached in <u>United States v. Kleinebreil</u>, 966 F.2d 945 (5th

Cir. 1992), which holds that the Sentencing Guidelines "do not permit an acceptance of

responsibility adjustment to be first applied to each separate group.  <u>Id.</u> at 953 (citing

<u>United States v. McDowell</u>, 888 F.2d 285, 293 (3d Cir. 1989) ("adjustment for acceptance

of responsibility . . . should be made only after the counts are combined"; "§ 1B1.1(e)

'does not contemplate calculating acceptance of responsibility for each offense'")); <u>see</u>

<u>also</u> <u>United States v. Thomas</u>, 242 F.3d 1028, 1034 (11th Cir. 2001) ("We align ourselves

with the other circuits and hold that acceptance of responsibility is all or nothing under §

3E1.1.  A defendant who fails to accept responsibility for all of the crimes he has

committed and with which he has been charged is entitled to nothing under § 3E1.1.").[2]

---

[2] There are non-Second Circuit cases that, at first glance, seem to reach a contrary result.  <u>See</u>, <u>e.g.</u>, <u>United States v. Wattree</u>, 431 F.3d 618, 622-23 (8th Cir. 2005) ("Where a defendant pleads guilty to all counts that are grouped for sentencing, contesting guilty only on non-grouped offenses, the guidelines do permit a two-level acceptance-of-responsibility reduction based on the totality of the circumstances.").  However, <u>Wattree</u> and the case on which it primarily relies, <u>United States v. Williams</u>, 344 F.3d 365, 380-81 (3d Cir. 2003), <u>cert. denied</u>, 540 U.S. 1167 (2004), concern sentencing where there is a conviction on a count requiring a mandatory minimum and consecutive term of imprisonment, such as 18 U.S.C. § 924(c).  Such crimes are explicitly excluded from application of the grouping rules, making them inapt comparisons to the instant case.  <u>See</u> U.S.S.G. § 3D1.1(b)(1) ("exclude from the application of §§ 3D1.2-3D1.5 . . . any count for which the statute (A) specifies a term of imprisonment . . . ; and (B) requires that such term of imprisonment be imposed to run consecutively . . . ").

Dominick Colasuonno relies on United States v. Kellum, 372 F.3d 1141 (9th Cir. 2004), to support his argument that the acceptance of responsibility provision of the Sentencing Guidelines may apply on a group-by-group basis.  However, Kellum is explicitly limited to offenses that are grouped, i.e., considered as one group, not, as in this case, two separate groups of offenses.  Id. at 1146 ("We hold that it is not clear error for a district court to grant a defendant charged in two separate indictments later grouped for sentencing a downward departure for acceptance of responsibility if the defendant pleads guilty to all charges in one indictment . . . even if the defendant goes to trial on the charges in the other indictment.") (emphasis added).  In this case, Dominick Colasuonno was convicted at trial of the offense in one group and pled guilty to the offenses in another separate group, presenting a situation not addressed by Kellum.

Separate from Dominick Colasuonno's request that he be granted acceptance of responsibility credit under the Sentencing Guidelines, he and Philip Colasuonno also argue that they should be sentenced more leniently because, in their plea agreements, they have waived their appellate rights, including attacks on their convictions, have pled guilty to tax crimes, and have stipulated to a loss calculation in their plea agreements.  See P. Colasuonno Letter at 11; D. Colasuonno Memo. at 44.  Should the Court grant the defendants credit for acceptance of responsibility, then the Court should not sentence them more leniently by virtue of the provisions of their plea agreements because the adjustment for acceptance of responsibility adequately reflects and, in effect, compensates

9

them for the provisions to which they have agreed.  If the Court does not grant the defendants credit for acceptance of responsibility, then the Court should take the provisions of their plea agreements into account in balancing the factors under Section 3553(a).  However, the Government submits that what the defendants agreed to in their plea agreements should not result in any meaningful leniency.

### III.    The Court Should Deny Philip Colasuonno's Motion for a Downward Departure Under U.S.S.G. §5H1.4.

Colasuonno asserts that his medical conditions -- primarily his heart condition -- warrants a downward departure, pursuant to U.S.S.G. § 5H1.4.  See Letter on behalf of Philip Colasuonno at 1, 5-7 (dated July 5, 2007) (describing defendant as "a walking medical time-bomb") (hereinafter "P. Colasuonno Letter").  For the reasons stated below, the Court should reject Philip Colasuonno's arguments.

The Sentencing Guidelines "provide considerable guidance as to the factors that are apt or not apt to make a case atypical, by listing certain factors as either encouraged or discouraged bases for departure."  Koon v. United States, 518 U.S. 81, 94 (1996).  Discouraged factors are not necessarily inappropriate bases for departure, but should be relied upon only "in exceptional cases."  Id.

 Health-based departures for physical condition are "discouraged" under the Sentencing Guidelines.  Section 5H1.4 provides:

> Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.  However, an extraordinary physical impairment may be reason to impose a sentence below the applicable guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

U.S.S.G. § 5H1.4.  Thus, in order to be entitled to a departure based on physical condition, a defendant must demonstrate that he suffers from an "extraordinary physical impairment."  See also Sapia v. United States, 433 F.3d 212, 219 (2d Cir. 2005) (post-Booker case, citing U.S.S.G. § 5H1.4 and holding that "[e]xcept for extreme situations, physical condition is not a basis for downward departures"); United States v. Persico, 164 F.3d 796, 806 (2d Cir. 1999) ("The standards for a downward departure on medical grounds are strict.").

In considering a downward departure based on the defendant's physical health, the Second Circuit has stressed that the determinative issue is whether the Bureau of Prisons (the "BOP") can monitor and treat adequately the defendant's medical condition.  See, e.g., United States v. Martinez, 207 F.3d 133, 139 (2d Cir. 2000) (affirming denial of downward departure where there was "no evidence in the record that [the defendant's medical condition] is of a type that cannot be adequately cared for within the prison system"); Persico, 164 F.3d at 806 (holding that downward departure under U.S.S.G. § 5H1.4 "requires medical conditions that [BOP] is unable to accommodate"); United States v. Altman, 48 F.3d 96, 104 (2d Cir. 1995) ("the BOP's ability to monitor a defendant's health condition countenances against a departure under U.S.S.G. § 5H1.4");

United States v. Brown, 338 F. Supp. 2d 552, 561-62 (E.D. Pa. 2004) (denying departure to defendant whose doctor described him as "a walking cardiovascular timebomb" because "[d]efendant did not meet his burden of establishing that [BOP] could not provide appropriate medical care for a person of [d]efendant's age and physical condition").

The post-Booker case law is consistent with this viewpoint. See Harris v. United States, Nos. 00 Cr. 105 (RPP), 04 Civ. 1113 (RPP), 2005 WL 1925435, *6 (S.D.N.Y. Aug. 10, 2005) ("the standard for a downward departure based on a defendant's physical condition is not met unless a defendant can show that [BOP] cannot accommodate his medical condition") (citing Altman, 48 F.3d at 104); Gutierrez v. United States, Nos. 04 Civ. 6529 (DAB), 02 Cr. 1312 (DAB), 2005 WL 2207026, *5 (S.D.N.Y. Sept. 6, 2005) (denying downward departure because defendant, who suffered from advanced diabetes, high blood pressure, severe renal failure, and glaucoma, had suffered two strokes, was relegated to a wheelchair, and required the use of a dialysis machine, "neither claims nor provides any evidence that such health problems cannot be adequately addressed in one of the Bureau of Prison's many medical facilities."); see United States v. Lucaina, 379 F. Supp. 2d 288, 293 (E.D.N.Y. 2005) (denying downward departure to 82-year old defendant, who suffered from diabetes, arthritis, high blood pressure, coronary artery disease, and other age-related maladies, because "ailments are not extreme or unusual, and there is no evidence that the bureau of prisons is not equipped to deal with them")

(citing <u>Martinez</u>, 207 F.3d at 139).

Other than merely asserting without any factual support that the "level of care he requires is <u>likely</u> not available even in a prison medical facility," P. Colasuonno Letter at 7 (emphasis added), Philip Colasuonno has not demonstrated that the BOP would be unable to minister to his medical needs. Indeed, Philip Colasuonno's physical condition is demonstrably one that <u>can</u> be cared for by the BOP. There are literally thousands of inmates in the custody of the BOP who suffer from illnesses similar to that of Philip Colasuonno. Once in the custody of the BOP, Philip Colasuonno would meet with the BOP's health services staff and would likely be placed in the cardiac care, diabetes, and hypertension clinics. <u>See</u> Letter from Barbara J. Cadogan, Health Systems Administrator, Bureau of Prisons at 2 (dated July 12, 2007) (attached hereto as Exh. G.1)); <u>see also</u> Barbara Cadogan, Curriculum Vitae (attached hereto as Exh. G.2). The BOP also has an extensive drug formulary and can provide Colasuonno with the specific prescription medications, or appropriate substitutions, that he has apparently required in the past for treatment. <u>Id.</u> The BOP would also be capable of administering these medications daily, as many times as medically required. <u>Id.</u> In short, as Dr. Cadogan opines, "based on the information provided to [her] and [her] knowledge of the BOP's medical resources, the BOP will be able to provide appropriate care" for Philip Colasuonno. <u>Id.</u> at 2-3.

Philip Colasuonno's grave assertions that he will die if imprisoned are largely speculative. Undoubtedly, prison would be more stressful for him than residing

comfortably in his home with his wife and children, as he requests, see P. Colasuonno

Letter at 6.  But nowhere does Philip Colasuonno provide any analysis from a medical

expert, let alone one with knowledge of the level of stress associated with a prison

environment, suggesting that: (1) prison will be excessively stressful for him, including if

he is designated to serve a term of imprisonment at any of the several federal medical

centers maintained by the BOP; (2) he will be unable adjust to prison life, as a great many

inmates (indeed, the majority of inmates) successfully do; and (3) prison will, as a

practical matter, result in his death.

Accordingly, because the BOP can care for Philip Colasuonno's various medical

conditions, Philip Colasuonno has failed to satisfy his burden to demonstrate by a

preponderance of the evidence an entitlement to a departure under Section 5H1.4.  The

Court should therefore deny his departure motion.

## IV.    A Guidelines Sentence Is a Reasonable Sentence.

Following the Supreme Court's decision in United States v. Booker, 543 U.S. 220

(2005), the Second Circuit has stressed the importance in sentencing of considering the

Sentencing Guidelines, one of the several factors required to be considered by 18 U.S.C.

§ 3553(a).  First, the applicable Guidelines range should serve as "a benchmark or a point

of reference or departure."  United States v. Fernandez, 443 F.3d 19, 28 (2d Cir. 2006)

(citing United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005)); see also Crosby,

397 F.3d at 113 ("[I]t is important to bear in mind that Booker and section 3553(a) do

more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.") (citation omitted). Second, the Second Circuit has recognized that "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." Fernandez, 443 F.3d at 27. In this case, the Court should reject the defendants' various arguments as to why a non-Guidelines sentence adequately balances the Section 3553(a) factors. In this case, a Guidelines sentence is a reasonable one and properly reflects the Section 3553(a) factors.

### A.    This Case Is Not Outside the Heartland of Fraud Cases.

The defendants collectively come up with a host of reasons why they believe that this case is outside the heartland of fraud cases and therefore should result in a lower sentence for them. None of the reasons, either individually or collectively, should result in a lower sentence.

First, Philip Colasuonno claims that "the motivating factor for the Colasuonnos' conduct was not greed but business survival including the employment of hundreds of hard-working employees." P. Colasuonno Letter at 4. But neither Philip nor Dominick Colasuonno explains (let alone proves) that this is true or, if so, why it matters. The Colasuonnos owned 2/3 of both Prima and American Armored Car, Ltd. ("AAC"), and their personal economic predicaments were largely determined by the continued existence and health of these two companies. When they chose to deceive Chase, the purpose was

to guarantee that Chase would continue to lend Prima money, thereby guaranteeing the future of Prima. And when they chose, as the owners of AAC to engage in a scheme to defraud the Internal Revenue Service ("IRS") of hundreds of thousands of dollars in payroll taxes over a number of years, the purpose was to prop up their business, AAC. Even if a collateral result of their criminal conduct was to ensure that employees of these businesses remained employees, it is hard to see how this remotely excuses or mitigates their various criminal offenses. If their businesses could not survive without committing crimes, then the Colasuonnos should have taken steps to remedy their predicament without engaging in criminal conduct. A person who commits crimes, in part, to guaranteed his own economic health and to save an employee's job is neither more morally superior, nor less culpable, than a criminal who commits crimes to line his pockets with cash. Even if it were true, the purported justification of their crimes -- that they did it to keep jobs for their employees -- does not militate in favor of a lower sentence. Furthermore, it is hard to see how the motivation for the defendants' crimes was to save more than a few jobs. As perhaps the starkest example, the payroll tax conspiracy saved AAC at most $180,000 in any given year, hardly an expense that, if incurred, would have resulted in layoffs of more than a few AAC employees.

Next, Philip Colasuonno claims that "the initial line of credit the Colasuonnos received from Chase was based on entirely accurate information." P. Colasuonno Letter at 4. Why this matters is left entirely unexplained by the Colasuonnos. The fact remains

16

that every year -- as the Colasuonnos were well aware -- Chase re-evaluated the loan

extended to Prima, in particular the amount by which Prima was permitted to overdraw

their account under a line of credit.  In doing so, every year, Chase required that the

Colasuonnos submit audited financial statements that Chase trusted had truly been audited

by an accountant independent of Prima and the defendants.  Indeed, every day, Chase lent

Prima money for use in its current operations.  It simply does not matter -- and certainly

does not militate in favor of a lower sentence -- that Chase was deceived about Prima's

economic health <u>during</u> the course of their relationship as opposed to <u>at the beginning</u>.

The fact remains that, starting in about early 2002, the defendants lied about their

financial health and those lies, which continued until at the earliest late 2004, were

unquestionably material to Chase's lending decisions, both whether to extend credit to

Prima and on what terms.

Next, Philip Colasuonno claims that "the Colasuonnos' collective conduct belies

any intent to cause Chase monetary loss."  P. Colasuonno Letter at 5; <u>see also</u> <u>id.</u> at 10.

This is preposterous.  What can it mean when a defendant lies -- to the tune of millions of

dollars -- about the value of his company?  And what can it mean when a defendant

engages in a practice designed to deceive his bank about the amount of money that the

defendant maintains at the bank and, thereby, influence the bank's lending decisions?

What the defendants conduct means is that they sought to deceive Chase into lending the

Colasuonno's company money by denying Chase the information necessary for Chase to

make informed lending decisions.  Just as a belief that everything would work out in the

end and that a deceived lender would suffer no "ultimate harm" is not a defense to a fraud

charge, see, e.g., United States v. Dinome, 86 F.3d 277 (2d Cir.1996) (proper to instruct

jury that defendant's belief that lender would suffer no ultimate harm was appropriate

where "defendant's act of intentionally supplying false information on a mortgage

application was a proper basis for a mail fraud conviction because it deprived the bank of

the right to control its assets and 'diminished the ultimate value of the [mortgage]

transaction to the bank as defined by its standard lending practices'"), that the

Colasuonnos hoped that everything would work out in the end -- and that they would be

able to repay Prima's debts to Chase -- simply does not suggest that they be sentenced

more leniently than otherwise.  They had to know that lying to and deceiving about a host

of important details about Prima's business might come back to haunt them and Chase.

Even if they did not specifically intend to cause loss at the end of the day by lying and

deceiving Chase, they undoubtedly were aware of the high probability that their lies and

deception would ultimately result in loss to Chase, thereby subjecting Chase to a great

risk of loss.  And they were surely aware that the immediate effect of their lies to Chase

was that Chase would continue to lend them money.

Philip Colasuonno next claims that the defendants' conduct is outside the heartland

of bank fraud cases because they had invested some of their own money in Prima.  P.

Colasuonno Letter at 4.  Other than simply saying this is so, the Colasuonnos do nothing

to demonstrate why their case is unlike the many instances where proprietors of businesses who have invested in those businesses seek loans for those business under false pretenses. U.S.S.G. § 2B1.1 is designed to encompass the wide variety of ways in which property crimes -- including not only bank fraud, but wire fraud, mail fraud, and other types of fraud -- may take place, evidenced perhaps most starkly by the fact that the rules and subrules for determining offense levels in property crimes encompass nearly 20 pages of text of the Sentencing Guidelines themselves. The heartland carved out by Section 2B1.1 is indeed broad in scope and the defendants' conduct is well within that broad landscape.

Philip Colasuonno next claims that the fact that Chase conducted itself in a certain way at the end of its relationship with Prima -- seeking an immediate payment of half of the debt owed by Prima rather than agreeing to have Prima pay the entire amount over a term of years -- reflects somehow favorably on the Colasuonnos' criminal conduct, such that a lower sentence is warranted. P. Colasuonno Letter at 4. This is ridiculous. Choices made by the victim in how best to mitigate the losses caused by a defendant's prior criminal conduct simply reflect nothing about the egregiousness of the defendant's conduct. Chase made a rational business decision -- indeed, one that arguably resulted in a windfall to the Colasuonnos in the form of forgiveness of $3.5 million of debt -- to sever its ties to Prima. Why this decision gives any indication -- one way or the other -- about how to sentence the Colasuonnos is not remotely explained, let alone justified, by

19

the defendants.

The same is true for the claim that because "Chase had itself made substantial mistakes with respect to money it owed to Prima," the Colasuonnos should be sentenced more leniently.  P. Colasuonno Letter at 4; D. Colasuonno Memo. at 44-45.  What the defendants refer to is an e-mail in which Chase identifies approximately $500,000 of adjustments to fees previously charged to Prima.  D. Colasuonno Memo., Exh. E.  Of course, the defendants do not allege, and cannot prove, that Chase intentionally or fraudulently overcharged Prima.  Chase's allegedly overbilling Prima simply does not speak to the issue of how much of a sanction should be imposed upon the defendants as part of a criminal sentencing.

In arguing about this e-mail, Dominick Colasuonno states that the "Colasuonnos filed suit against Chase and Chase's forensic accountants, Cohen & Mahoney [sic]" and asserts that the suit seeks, among other things, "recovery of the overcharge in the email." D. Colasuonno Memo. at 45.  This is demonstrably false and a grave misrepresentation of the nature of this suit.  The suit filed by the defendants and others in Westchester County (which the Government was forced to obtain stay of in order to prevent the defendants from circumventing the criminal discovery rules applicable in the criminal case) asserts claims -- each more legally and factually preposterous than the next -- for, among other things, libel, interference with contractual relations, intentional infliction of emotional distress arising out of Mahoney Cohen's work on behalf of Chase.  Not once does the

defendants' complaint mention the issue of supposed overcharges by Chase, let alone seek damages for them.  See Prima Check Cashing, Inc. v. JPMorgan Chase & Co., Index No. 10905-2006 (Sup. Ct. Westchester County) (attached hereto as Exh. H). Furthermore, the settlement agreement entered into by Chase and the defendants, releases all claims that the defendants have, or could have, against Chase.  See D. Colasuonno Memo., Exh. C at § 3.2.  This renders the defendants' claim for an offset of any restitution order in favor of Chase by the amount of the supposed overcharges patently frivolous, as well as far beyond the procedures that govern criminal restitution orders. See 18 U.S.C. § 3663, 3663A, and 3664.

## B.    Dominick Colasuonno's Arguments About His Criminal Conduct Are Meritless.

Dominick Colasuonno devotes substantial parts of his brief to arguing that his bank fraud conviction is "tenuous" and, indeed, asserts that it was legally and factually insufficient.  D. Colasuonno Memo. at 23-44.  But it should not be forgotten that his brief is a sentencing submission.  Dominick Colasuonno filed no Rule 29 motion seeking a ruling from the Court that his conviction should be overturned, nor did he file a Rule 33 motion seeking a new trial.  Indeed, he elsewhere seeks leniency based on the fact that he is foregoing an attack on his conviction and "waiving his right to pursue and possibly win a reversal of his conviction."  Id. at 44.  Accordingly, Dominick Colasuonno has repeatedly and emphatically waived the arguments that his conviction was legally insufficient.  What he does seek is leniency on the basis of the claimed tenuousness of his

21

conviction.  There can be little doubt, however, about the soundness of his conviction.  A properly instructed jury (Dominick Colasuonno does not contend that the Court's legal instructions were deficient in any way) took relatively little time to conclude that Dominick Colasuonno was guilty beyond a reasonable doubt of bank fraud.  And, viewing the evidence in the light most favorable to the Government, it is clear that Dominick Colasuonno was guilty of participating in both the fixed assets fraud on Chase and the float fraud on Chase.

### 1. Dominick Colasuonno Was Not "Acquitted" of the Fixed Asset Fraud.

Dominick Colasuonno devotes the greatest portion of his sentencing submission to Prima's practice of parking money obtained from AAC and AAC's customers into Prima's account at Chase.  He relegates to a footnote his claim that he was "acquitted" of the fixed assets fraud.  The Court can reject this in short order.

First, Dominick Colasuonno seems to suggest that, as part of Count Two of the Superseding Indictment that was tried, he was not charged with participating in the fixed assets fraud.  D. Colasuonno Memo. at 24 n.2 (disputing the notion that the reference to financial statements in Count Two of the Superseding Indictment can be deemed to include the fixed asset theory).  This is preposterous.  The "to wit" clause of Count Two of the Superseding Indictment charged, among other things, that Dominick Colasuonno and Philip Colasuonno "submitted, and caused to be submitted, to [Chase] false and fraudulent financial statements for [Prima], which materially misstated, and omitted

material facts regarding, the true financial condition of Prima in connection with Prima's

obtaining and maintaining loans and other lines of credit from Chase."  And Count Two

specifically incorporated by reference all allegations relating to the fixed assets fraud,

primarily, paragraph 9 of the Superseding Indictment, which charged:

> For example, starting in or about early 2002 (when Prima submitted audited
> financial statements for fiscal year 2001), Prima's annual audited financial
> statements inflated the amount of fixed assets held by Prima by at least
> approximately $3.9 million.  The fraudulent inflation of the amount of fixed
> assets held by Prima continued until in or about late 2004, when a
> representative of Chase discovered that the fixed assets were inflated.

Indictment S1 05 Cr. 1110 at ¶ 9.

Second, the fair inference from the evidence is that Dominick Colasuonno was

well aware of the fixed assets fraud and, as a member of management who was

responsible for the financial statements and who was primarily and intimately involved in

Prima's relationship with Chase, participated in it.  The relevant facts are as follows:

- In about late 1999, Prima's then-controller, Anthony Parisi informed
  Dominick Colasuonno that there was a deficit of $1.8 or $1.9 million
  in a cash clearing account, representing money that was leaving
  Prima and that Parisi was unable to reconcile the deficit, despite
  efforts to do so.  Tr. 1604-06, 1628, 1675-76.

- Dominick Colasuonno was upset, angry, and frustrated by Parisi's
  revelation of the deficit and his inability to reconcile it, and shouted
  at him.  Tr. 1607, 1622.

- Parisi informed Philip Colasuonno of this problem in 1999 or 2000.
  Tr. 1607-08, 1652.

- In 2005, Parisi spoke with Michael Colasuonno, who told him that
  he, Dominick, or Philip Colasuonno had been unable to reconcile the

23

money in the cash clearing account and the unreconciled amount was divided up among the various Prima store locations.  Tr. 1699-1700.

• Philip Colasuonno discussed the issue of the missing money with his brother Dominick Colasuonno, who had learned of the issue from Parisi, and, given the size of the discrepancy, Dominick Colasuonno requested that Philip Colasuonno "please come over and take a look at it and see if we can't straighten it out."  Tr. 2094-95, 2222-24.

• Ultimately in response to this request, Philip Colasuonno spent months at Prima's offices, primarily after mid-2001 -- where Dominick Colasuonno had his office -- seeking to reconcile the problems caused by the discrepancy, which grew over the course of Philip Colasuonno's analysis to $3.9 million.  Tr. 2098, 2113, 2238, 2244.

• As part of determining why the amount grew from $1.9 million to $3.9 million, after mid-2001, Philip Colasuonno instructed Dominick Colasuonno and John Armas, the controller who succeeded Parisi, to physically count cash in the Prima stores.  Tr. 2113.

• Philip Colasuonno's solution to the problem that Dominick Colasuonno asked him to solve was to add $3.9 million to Prima's fixed asset accounts, which he took from a variety of accounts, including the cash clearing account.  Tr. 2243-44.

• Philip Colasuonno described this solution on a piece of adding machine tape containing the amounts that were added to various fixed asset accounts as: "This was how missing funds were handled." GX-214-B (attached hereto as Exh. I.1).

• The solution resulted in a misstatement of Prima's fixed assets in that Prima did not acquire an additional $3.9 million of fixed assets. See Exh. J (summary chart of testimony relating to acquisition of fixed assets that was used by Government during summation). Given that (1) Dominick Colasuonno was intimately familiar with the problem of the missing $3.9 million; (2) had directed Philip Colasuonno to solve this problem; and (3) was well aware that $3.9 million of fixed assets had emphatically not been acquired during the years 1998 through 2000, it is fair to infer that Dominick Colasuonno

24

knew what solution Philip Colasuonno had opted for.

- Dominick Colasuonno had every motivation to explain the missing $3.9 million. He was a one-third owner of Prima and Chase was the primary lender to Prima, such that if Chase no longer lent money and provided currency services to Prima, Prima would be financially crippled. And there was no way that Chase would accept the true explanation -- that Prima had lost track of $3.9 million of cash.

Viewing this and all of the other evidence at trial in the light most favorable to the Government should lead the Court to the conclusion that Dominick Colasuonno participated in the fixed assets fraud.

### 2.    The Defendants' Practice of Parking Money Obtained from AAC In Prima's Account at Chase Defrauded Chase.

Dominick Colasuonno next argues that the defendants' practice of parking money that Prima obtained from Chase in Prima's bank account at Chase did not defraud Chase. In doing so, Dominick Colasuonno largely ignores the compelling evidence that, indeed, Chase was fundamentally mislead by the defendants' failure to disclose that they were holding money that had to be returned to AAC's customers for multiple days in their Prima account at Chase, thereby inflating its balance. Viewed in the light most favorable to the Government, the evidence of this fraud can be summarized as follows:

- AAC picked up the funds of customers such as Caribbean Air Mail ("CAM") and Strauss Discount Auto and was legally obligated to have returned that money the next business day. Tr. 491 (testimony of Caingth Guerrier), 1343 (testimony of Steven Provenzano),

- For example, during a six-month period in 2003, no deposits for Strauss Discount Auto were made the next business day. Tr. 1346-47. As for CAM, based on an analysis of 384 pickups, the average

delay beyond one day in returning was more than 2 banking days. That is to say, on average, money was returned to CAM 3 banking days after it was picked up, rather than 1 day after it was picked up, as it should have been.  See generally GX-513-R.  This was completely inconsistent with the industry standard, as testified to by Charles Strebeck (a former AAC employee), Andre Ya Deau (the defendants' armored car expert), and Laurie Benjamin (a former AAC salesperson).

• During the period of time when AAC picked up the money from customers such as CAM and Strauss Discount Auto, that money was deposited into Prima's account at Chase.  This increased Prima's bank balance by multiple millions of dollars and, given the repetition of this practice by Prima on a regular basis, maintained the account in an inflated state over a lengthy period of time.  See, e.g., GX-150, 156; see generally Exh. I.2 (demonstrative exhibit used by the Government during its summation).

• Chase was unaware that Prima was holding money that it had obtained from AAC for several days or more.  See, e.g., GX-150, 151, 152, 156 (attached hereto as Exh. I.3); Tr. 2098-02 (testimony of Michael Dupnak).  Contrary to Dominick Colasuonno's assertions of the lack of an omission, this was a gigantic one.

• In April 2004, Prima's account balance at Chase plummeted by more than $2 million in the course of a few days.  That is to say, Prima's overdraft grew by more than $2 million during a very short period of time and, from Chase's perspective, Prima was indebted to it by $2 million more than Chase had previously believed.  The decrease was due to Prima's losing Caribbean Air Mail as a customer.  See, e.g., Exh. I.3.  This was a great increase in Chase's exposure to a loss, since it was no owed $2 million more by Prima than Chase believed just a few days earlier.

• Not only did the defendants not disclose the practice of parking the money of AAC's customers in Prima's Chase account, nowhere on Prima's financial statements did Prima disclose to Chase that Prima was, in essence, borrowing money from AAC for a short period of time (money that AAC was to have returned to AAC's customers).  Tr. 850.  For example, Prima's 2003 financial statements (GX-235)

26

reflect current liabilities in the form of a bank overdraft from Chase, short term liabilities to Chase, accounts payable, and amounts payable to a money order company. And it cannot be said that amounts due from Prima to AAC's customers are obviously "accounts payable." No separate debt to AAC was recorded on Prima's books. Again, contrary to Dominick Colasuonno's claims of a lack of an omission, this was, for sure, an important one.

These facts, and other adduced by the Government at trial, make clear that the Government's prosecution of the defendants -- and their convictions -- for bank fraud based on their parking money derived from AAC's customers into Prima's account at Chase was more than legally and factually sufficient. Dominick Colasuonno's arguments to the contrary -- lengthy they may be -- are largely beside the point.

### C.    In This Case, A Guidelines Sentence Is Reasonable.

In this case, the defendants conduct involves what amounts to defrauding Prima's primary lender in two different ways and, via another of their companies, AAC, failing to comply with their legal obligations with respect to payroll taxes. Given the wide scope of the defendants' criminal conduct and the fundamentally important business relationship with Chase that the defendants poisoned with fraud, a Guidelines sentence for both defendants is appropriate. The Court should sentence Dominick Colasuonno to between 41 and 51 months' imprisonment and Philip Colasuonno to between 46 and 57 months' imprisonment.

By virtue of the trial, the Court is fully familiar with the manner in which the defendants executed the fraud on Chase. Except to respond to various arguments of the

defendants, the Government has not here summarized the totality of the evidence against the defendants.  What the Government wishes to stress at this point was that the relationship with Chase was the most important business relationship that Prima had. The lending and currency services provided by Chase, since the late 1980's, were unique and were literally the backbone on which the defendants built Prima.  And they defrauded Chase into continuing to lend Prima millions of dollars, in part, by hijacking their outside auditors, Ambrose & Savolskis, which did little actual auditing work.  In particular, the Court will recall that Thomas Savolskis, the outside accountant primarily responsible for the "audit" of Prima and AAC, did virtually nothing to determine whether the change in Prima's net fixed assets from 2000 ($2,189,322) to 2001 ($6,540,502) represented the truth of Prima's financial circumstances.  Instead, Savolskis relied entirely on information provided to him by Philip Colasuonno.  Tr. 1040-41, 1062; GX-205 at 2, 6 (2000 financial statements); Exh. C at 2, 7 (2001 financial statements).  Among other information that Philip Colasuonno provided to Savolskis was a spreadsheet purporting to evidence the acquisition of nearly $3.9 million of fixed assets in 1998, 1999, and 2000, GX-131-B (attached hereto as Exh. K), which Savolskis dutifully provided to Chase.  As the Government proved at trial, the amounts contained in GX-131-B were wildly inflated. Attached hereto at Exhibit J is the demonstrative exhibit that the Government used during its summation, which contrasts what Chase was told about Prima's fixed assets with the true facts to which various prescient witnesses (including David Figari, a builder, and

Christopher Aulet, a longtime Prima employee) testified.

As for their tax crimes, what the defendants did was cook up a scheme, not only for AAC to avoid withholding payroll taxes from its employees, but also to avoid making AAC's payroll tax payments. Over the life of the conspiracy, the defendants failed to withhold from their employees paychecks and to pay to the IRS the employer's portion of payroll taxes, for a total tax loss of nearly $800,000. And the defendants did not just fail to withhold and make the necessary tax payments, but they also created records to obscure these facts. In particular, the defendants wrote, and caused to be written, weekly checks made payable to FJC Security Services, Inc. ("FJC"), representing cash payroll to be made to employees of AAC. They created these documents even though AAC had no ongoing business relationship with FJC during this period and the sole purpose of the checks made out to FJC was to cover up and disguise the payment of cash payroll to employees of AAC. The defendants would thereafter cash, and cause to be cashed, the checks made payable to FJC at Prima without the knowledge or involvement of FJC or any representative of FJC. AAC would then account for cash payroll to its employees in its books and records as payments for "outside services." United States v. Dominick Colasuonno and Philip Colasuonno, Information 07 Cr. 555 (AKH) at ¶¶ 5-6.

In addition to this criminal conduct comprising the charges of conviction, Dominick Colasuonno sought to prop up his businesses via other criminal means. Dominick Colasuonno endeavored in late 2003 to borrow money that he believed was the

proceeds of crime from a person he believed to be a "made" member of an organized

crime family.  The Government sought to prove these facts at trial pursuant to Rule

404(b) and would have done so primarily through statements made by Dominick

Colasuonno himself at a meeting with the Government.  Attached hereto as Exhibit L is a

summary of the statements made by Dominick Colasuonno at a meeting with the

Government that occurred several weeks before trial, together with a surveillance

photograph of Dominick Colasuonno exiting the meeting.  The purpose of the loan sought

by Dominick Colasuonno was for him to prop up his ailing companies, Prima, AAC, and

a garbage hauling company owned by Dominick Colasuonno, American Compaction

Systems, Inc. ("American Compaction").[3]  To the lender, the transaction represented a

way to launder dirty money.

Specifically, in or about late 2003, Dominick Colasuonno arranged through an

intermediary to approach John "Buster" Ardito ("Ardito") to obtain a loan of

approximately $1 million for businesses that Dominick Colasuonno owned.  See Exh. L at

---

[3] Private garbage hauling companies that operate in the City of New York, such as
American Compaction, are heavily regulated by the Business Integrity Commission
("BIC"), a law enforcement and regulatory agency previously known as the Organized
Crime Control Commission.  See http://www.nyc.gov/html/bic/html/home/home.shtml.
Among other things, private garbage hauling companies licensed by BIC are required to
maintain audited financial statements, which must be made available to BIC.  See N.Y.
Admin. Code § 16-520(c).  Philip Colasuonno created financial statements for American
Compaction that had purportedly been audited by Ambrose & Savolskis, when, in truth
and in fact, no such audit ever took place.  See Tr. 980 (testimony by Tom Savolskis that
his accounting firm did not auditing work for American Compaction); GX-309 (attached
hereto as Exh. M); Tr. 1289 (GX-309 provided to forensic accountant Vincent Marzella).

1, 2.  Prior to this, Dominick Colasuonno had inferred that Ardito, whom he had known since approximately 1994 or 1995, was a "made" member of an organized crime family. Philip Colasuonno was aware of Dominick Colasuonno's attempt to borrow money from Ardito, although he later told Dominick to go elsewhere.  Exh. L at 3-4.

At the time that he sought out Ardito, Dominick Colasuonno was desperate for money to use in his businesses, including Prima, AAC, and American Compaction.  See Exh. L at 1, 2.  As Dominick Colasuonno described it, his "back was against the wall." Dominick Colasuonno's first option for obtaining funds for his businesses (borrowing money from someone named Pat Simone) had failed and Ardito was his second option. See Exh. L at 2, 7.  Dominick Colasuonno's third option was for him and his brothers to mortgage their homes.  Amazingly, Dominick Colasuonno sought to launder money for a "made" member of organized crime rather than mortgage his home.  See Exh. L at 2. Several days later, Dominick Colasuonno met with Ardito, among others, at a restaurant. See Exh. L at 1, 7.

At the meeting, Dominick Colasuonno proposed that Ardito lend him money at an interest rate of between 6% and 8% and the discussion that took place at the meeting concerned the mechanism by which Dominick Colasuonno would be able to pay the money back to Ardito without having anyone be able to know about the nature of the transaction, such as back-dating a loan from Ardito to Dominick Colasuonno.  See Exh. L at 3, 4.  Although Dominick Colasuonno initially stated in his meeting with the

31

Government that he did not think that Ardito's money was the proceeds of crime, Dominick Colasuonno subsequently admitted that he assumed that the money he was seeking to borrow from Ardito was the proceeds of crime. <u>See</u> Exh. L at 3, 4. Ultimately, no transaction with Ardito ever occurred.

In short, given the criminal conduct engaged in by the Colasuonnos through Prima and AAC, it is fair to say that these companies were thoroughly infected with criminality. Notwithstanding this fundamental fact, the defendants each argue that the financial hardships that they allege stem from their prosecution should result in leniency. P. Colasuonno Letter at 10; D. Colasuonno Memo. at 21-23.

Although defendants ascribe all of their financial hardships to their prosecution, it is fairer to say that their financial woes are due in large measure to their erection of a financial house of cards. In short, the defendants took out loans that Prima had little hope of repaying. For example, the largest of all the liabilities that the defendants currently have stems from Prima's borrowing approximately $6.8 million from Moneygram Payment Systems, Inc. ("Moneygram"), a money order company whose products Prima offered to the public. This is a joint and several liability of the defendants, their brother (Michael Colasuonno), and the Colasuonno brothers' wives. And Prima continuously extended loans to its affiliates, AAC and American Compaction -- businesses that were barely profitable, if at all -- that AAC and American Compaction had little hope of repaying. It is not solely (or even primarily) this prosecution that has caused financial

32

problems for the defendants, but rather the wild overextension of their borrowings.[4]

**V.    The Court Should Impose Restitution in the Amount
        of $781,467.04 in favor of the United States.**

The defendants, in their plea agreements, each separately agreed that the Court

"must impose an order of restitution with respect to the total tax loss caused by the

defendant's conduct." <u>See</u> Exhs. A.1 at 1-2; A.2 at 1-2.  The total tax loss caused by the

offenses charged in Information 07 Cr. 555 (AKH) is $781,467.04, which represents the

sum of the payroll taxes that the defendants failed to withhold from their employees and

pay over to the IRS and, separately, the employer's payroll taxes that the defendants

failed to pay.  The Court should impose this amount as restitution and should impose it

between the defendants as a joint and several liability.  Neither defendant makes any

argument why this aspect of their plea agreements should not be fully enforced.

Given the breadth of the defendants' criminal conduct and its effect on Chase, the

Court should impose a Guidelines sentencing of between 41 and 51 months'

imprisonment for Dominick Colasuonno and between 46 to 57 months' imprisonment for

Philip Colasuonno.

---

[4] In this regard, the Government has numerous questions concerning the financial
information submitted by Philip Colasuonno that it expects to raise at sentencing, should
the Court wish to hear argument about the specifics of his financial circumstances.

## **CONCLUSION**

For the reasons set forth above, the Court should: (I) adopt the loss calculation agreed to by the parties; (II) deny the defendants credit for acceptance of responsibility under U.S.S.G. § 3E1.1; (III) deny Philip Colasuonno's motion for a downward departure under U.S.S.G. § 5H1.4; and (IV) sentence Dominick Colasuonno to a term of imprisonment of between 41 and 51 months and Philip Colasuonno to a term of imprisonment of between 46 to 57 months; and (V) impose restitution on the tax offenses in the amount of $781,467.04.

Dated:      July 12, 2007
            New York, New York

                            Respectfully submitted,

                            MICHAEL J. GARCIA
                            United States Attorney


                    By:  ____/s/_____
                            Daniel W. Levy/Thomas G. A. Brown
                            Assistant United States Attorneys
                            Telephone:  (212) 637-1062/-2194

<u>CERTIFICATE OF SERVICE</u>

I, Daniel W. Levy, affirm under penalty of perjury that:

1.      I am an Assistant United States Attorney for the Southern District of New York.

2.      On July 12, 2007, I caused a true and correct copy of the foregoing GOVERNMENT'S SENTENCING MEMORANDUM, together with the exhibits attached hereto, to be served by Clerk's Notice of Electronic Filing, upon the following attorneys, who are filing users in connection with <u>United States v. Colasuonno, <em>et al.</em></u>, S1 05 Cr. 1110 (AKH):

> Alan S. Futerfas, Esq.
> 260 Madison Avenue, 22nd Floor
> New York, New York  10016-2400
>
> Michael G. Dowd, Esq.
> Law Office of Michael G. Dowd
> 112 Madison Avenue, 3rd Floor
> New York, New York  10016-7416
>
> Counsel to defendant Dominick Colasuonno
>
> Richard Levitt, Esq.
> Law Offices of Richard Ware Levitt
> 148 East 78th Street
> New York, New York  10021
>
> Martin L. Schmukler, Esq.
> Martin L. Schmukler, P.C.
> 41 Madison Avenue, Suite 5B
> New York, New York  10010
>
> Counsel to defendant Philip Colasuonno

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Dated:      July 12, 2007
            New York, New York


                                    _____/s/_____
                                    Daniel W. Levy
                                    Assistant United States Attorney
                                    Telephone:  (212) 637-1062

ii